# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MICHAEL E. POLANSKY,        )
                                       )
           Plaintiff,           )
                                       )
                                     )
           v.               )       No. 04 C 3526
                                     )
JOSEPH ANDERSON,           )
ANDERSON RACING          )
                    Defendants.    )

## MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

       Presently before us are Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and the related Motion to Strike Affidavits in Whole or in Part and Other Relief. Plaintiff Michael Polansky alleges that Defendants Joseph Anderson and Anderson Racing, Inc. defrauded him in connection with his 2003 purchase of three Illinois-bred race horses from non-party Robert Waxman, resulting in Polansky's overpayment for the horses to the benefit of Defendants. Polansky further claims that Defendant Anderson breached the fiduciary duty owed to Polansky and that Defendants engaged in a civil conspiracy to commit such fraud. In their Rule 56 motion, Defendants contend, among other things, that Polansky failed to establish the existence of a fiduciary duty or any misrepresentation necessary for a fraud action. Defendants also challenge certain aspects of three affidavits put forth by Polansky to defeat summary judgment. For the reasons set forth below, we grant in part and deny in part Defendants' motion to strike. We also grant the Motion for Summary Judgment as to Count II (breach of fiduciary duty), but deny it as to

the fraudulent concealment claim in Count I and the related conspiracy claim in Count III.  Finally, we grant Defendants' motion in favor of their breach of contract counterclaim for $5898.50.

## I.     DEFENDANTS' MOTION TO STRIKE AFFIDAVITS

Before addressing the merits of the summary judgment motion, we first resolve Defendants' motion to strike, in whole or in part, the affidavits of Michael Polansky, Thomas Harmer and Robert Boni, submitted by Polansky with his opposition brief.  Defendants contend that these affidavits fall short of the requirements of Rule 56(e), which states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (noting that affidavits based on personal knowledge may include reasonable inferences, so long as those inferences are based on observation or first-hand experience; *Vissier v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  When addressing the sufficiency of such affidavits, the Seventh Circuit has held that "[e]vidence presented to defeat a summary judgment motion need not be in admissible form, but it must be admissible in content."  *Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).  While we decline to strike these affidavits in whole, we agree with Defendants that portions thereof cannot be considered in deciding this summary judgment motion. *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998) (holding that court cannot consider "parts of an affidavit that are insufficient under Rule 56(e)").

A.      *Affidavit of Michael Polansky*

With respect to Polansky's affidavit, we strike all but the first three sentences of paragraph 1. (*See* Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 1.)  As Defendants contend, the remainder of this hyberbolic paragraph is conclusory and void of supported facts.  *See Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and is not a recitation of 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded."); *see also Tel-Lock, Inc. v. Thomson Consumer Elecs.*, No. 03-320, 2005 WL 741930, at *4 (N.D. Ill. Mar. 30, 2005).

We also strike the second sentence and the opening clause of the fifth sentence of paragraph 2, as Polansky fails to establish how he might have first-hand knowledge of Mr. Gelrod's thought processes.  For example, while Polansky states that "[u]nbeknowst' to [him]," Gelrod was facing suspension and "was obviously looking for a new way to support himself," his affidavit lacks any facts about how he now knows these alleged facts to be true.

Because the third, fourth and fifth sentences of paragraph 4 lack specificity about who gave Polansky this information, we cannot rely on his statements as evidence of any representations – or misrepresentations – made by Defendants.  (*See* Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 4 ("I was told that Mr. Waxman was suffering financial difficulties . . . . I was told that the purchase price was $350,000.").)  Contrary to Polansky's assertion, his affidavit does not state that Defendants provided this information.  (Pl.'s Opp. to Mot. to Strike at 3.)  These statements suffice to show Polansky's state of mind, but no more.[1]

---

[1] We acknowledge, without deciding the issue, that Gelrod's comment(s) to Polansky could be admissible under Federal Rule of Evidence 801(d)(2)(E) as the statements of a co-conspirator.

We strike the second sentence of paragraph 6 because Polansky's affidavit fails to set forth any personal knowledge about Mr. Waxman's financial situation or the treatment of the horses. (*See* Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 6 ("I subsequently learned that this was a false representation. Because Mr. Waxman had fallen behind in his training bills owed to Erwin Miller, the trainer of the three horses, the horses were essentially being fed and watered and were not being trained.").) While this paragraph further describes Polansky's state of mind, he cannot testify as to the truth of these matters in an affidavit without actual knowledge.

As above, we cannot consider paragraph 8 as evidence in support of Polansky's claim that he was "victimized by Mr. Gelrod and Mr. Anderson." (*Id.* ¶ 8 ("Soon after I purchased the three horses, I began to hear rumblings and rumors passed on to me by others in the harness racing business that I had been victimized.").) Although this paragraph describes his state of mind and his reaction to rumors in the industry, Polansky acknowledges that his information is based on "rumblings and rumors." Accordingly, paragraph 8 is not admissible testimony as to whether he *was* victimized.

We decline to strike Polansky's statements in paragraph 9, to the extent that they rely on and summarize documents provided with his opposition brief. Otherwise, we agree with Defendants that Polansky's affidavit cannot include speculation as to the actions of Defendants without any personal knowledge.

We also deny the motion to strike as to paragraph 10. Nonetheless, we treat the first sentence as evidence only that Polansky believed Defendant Anderson was his agent and relied upon his expertise in deciding to buy the horses.. (*Id.* ¶ 10 ("Mr. Anderson was acting as my agent in the purchase of these horses.").) We do not consider this testimony as conclusive evidence that Mr.

Anderson in fact was Polansky's agent.

We similarly will not strike paragraph 11. And as with paragraph 10, we will not consider paragraph 11 as factual evidence supporting Polansky's claim that Mr. Anderson engaged in wrongdoing or diverted money. (*Id.* ¶ 11 ("Needless to say, I was not going to send any more money to someone who had illegally diverted $110,000 of the $350,000 that I had given him to purchase horses.").) We rely on these statements only to demonstrate Polansky's state of mind and his reasoning for refusing to pay Defendants' invoices for training services.

### B.   *Affidavit of Thomas Harmer*

Regardless of whether we consider Thomas Harmer as a fact or expert witness, we strike his affidavit entirely.[2] Harmer is not competent to testify as a fact witness, as he lacks personal knowledge of the horses and their disputed training. The affidavit does not explain how he has any first-hand information about the horses, which might enable him to assess their market value. It does not state that he trained, examined, treated or even observed the horses, at any time or for any purpose. Paragraph 2, moreover, contains only hearsay of what Harmer says Ervin Miller told him about the horses, their training, their owner's financial status and the purported asking price. (*See* Pl.'s Opp. to MSJ, Ex. 3, Harmer Aff. ¶ 2.) Accordingly, it cannot serve to rebut the contrary sworn testimony of Miller submitted by Defendants. Paragraph 3 is also inadmissible, as Harmer states

_____

[2] Polansky's response to the motion to strike does not account for Defendants' rather obvious typographical error. Defendants plainly sought to challenge paragraphs 2 through 4 of the Harmer affidavit, not paragraphs 1 through 3. (*See* Pl.'s Opp. to MSJ, Ex. 3, Harmer Aff.; Mot. to Strike at 5; Pl.'s Opp. to Mot. to Strike at 5.) Not recognizing, or simply ignoring this mistake, Polansky's arguments in defense of Harmer's affidavit are somewhat off-topic. (*See* Pl.'s Opp. to Mot. to Strike at 5, explaining how Harmer's statement regarding his state of residence is within his personal knowledge). We evaluate Polansky's response as it applies to the relevant paragraphs.

without foundation that he "came to learn that . . . Polansky had purchased the three horses and paid the sum of $350,000" and concludes that such "amount is twice what the asking price was." (*Id.* ¶ 3.)

Harmer's affidavit likewise cannot pass muster as expert testimony. Given that he lacks personal knowledge, Harmer's estimate of the horses' value is based on his "experience in the standardbred horse racing industry." (*Id.* ¶ 4.); *see, e.g., United States v. Conn*, 397 F.3d 548, 553-555 (7th Cir. 2002) (discussing differences between expert and lay testimony and concluding that agent's testimony about firearms collection was expert testimony, as it was based on his "training and experience"); *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (noting that "witnesses who are not expert witnesses . . . are permitted to testify only from their personal knowledge" and cannot provide "speculations, hunches, intuitions, or rumors remote from [their] experience"). Harmer, however, never describes his experience or how he might be qualified otherwise to offer an opinion on the value of the horses. While he states that he is "currently a licensed trainer of horses," he does not explain why that is sufficient to inform his assertion that the horses could not have been worth more than $200,000 as a group. (*Id.*) Although he testifies that he has "been involved in the standardbred horse business [his] entire adult life," we have no idea how old he is or how he was involved. Finally, it is undisputed that Polansky did not disclose Harmer as a potential expert witness, and thus his affidavit cannot be considered as such. *See, e.g.,* Fed. R. Civ. P. 26(a)(2).

### C. *Affidavit of Robert Boni*

Defendants contend that paragraph 3 should be stricken because Mr. Boni does not identify whether it was Mr. Anderson or Mr. Gelrod who informed him that Polansky bought the horses and

instructed him to distribute $30,000 of the proceeds to Mr. Gelrod. (*See* Pl.'s Opp. to MSJ, Ex. 4, Boni Aff. ¶ 3.) Rather, Boni testifies that it was either Mr. Anderson or Mr. Gelrod who provided this information. (*Id.*) We deny Defendants' motion with respect to this affidavit, however, because Boni's testimony falls within his personal knowledge. Boni's knowledge may be somewhat incomplete, but his inability to identify which of the two men gave him the information does not render him incompetent under Rule 56(e), nor does it suggest that his testimony is unreliable.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### SUMMARY OF THE FACTS[3]

In mid-2001, Plaintiff Michael Polansky entered the standardbred horse racing industry by purchasing racehorses. (Pl.'s Facts ¶ 7.) Monte Gelrod, a non-party, is a resident of the State of New Jersey and was a successful standardbred racehorse trainer at all times relevant to this action. (Defs.' Facts ¶ 8; Pl.s' Facts ¶ 5.) Defendant Joseph Anderson, a resident of the State of Illinois, is also a trainer of standardbred racehorses. (Defs.' Facts ¶ 7; Pl.'s Facts ¶ 2.) Joseph Anderson is the President of Defendant Anderson Racing, an Illinois corporation. (Pl.'s Facts ¶ 3.)

In the summer of 2002, Gelrod began to solicit Polansky as a client. (Pl.'s Facts ¶ 8; Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 2; Defs.' Facts ¶ 10.) At the time, Polansky owned horses racing in New York and New Jersey, and Gelrod repeatedly asked Polansky to allow him to train those horses. (Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 2.) Gelrod also encouraged Polansky to hire Anderson to train his Illinois horse, named *Piratesofpanzance*. (*Id.*) After speaking with

---

[3] Unless otherwise noted, the facts described herein are undisputed. We primarily rely on the submitted affidavits and deposition testimony, particularly where the parties' Local Rule 56.1 statements mischaracterize the actual evidence.

Anderson about *Piratesofpanzance* many times, Polansky transferred training of the horse to Anderson. (*Id.* ¶ 3.) As of September 2002, Gelrod had been training Polansky's horse *Star Role* and subsequently sent *Star Role* to Anderson for training and racing in the Windy City Pace. (*Id.*) With Gelrod's recommendation, Polansky purchased a horse, *Sir Rossini N*, from Anderson in January 2003. Anderson continued to train *Sir Rossini N*, with Polansky as owner. (*Id.*) Accordingly, as of early 2003, Anderson was training three of Polansky's horses located in Illinois, one of which Polansky had bought from Anderson.

In April 2003, Gelrod informed Polansky that Robert Waxman, a prominent Canadian owner, had three Illinois-bred horses for sale. (Defs.' Facts ¶ 11; Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 4.) According to their trainer, Ervin Miller, the horses – *Only Choice*, *Definitely Maybe*, and *Incredible Moe* ("Illinois Horses") – were outstanding two-year olds and were expected to perform well in the 2003 season.[4] (Defs.' Facts ¶ 13; Defs.' MSJ, Ex. 1, Miller Aff. ¶ 10.) Gelrod contacted Anderson to inspect the horses for possible purchase by Polansky. (Defs.' Facts ¶ 14.) Anderson then inspected the horses and advised Polansky that the horses were being trained regularly by Miller, were healthy and were "on their way to qualifying for their three-year old stake season." (Defs.' Facts ¶ 15.) Indeed, Gelrod and Anderson told Polansky that the Illinois Horses "were top horses that were training superbly for their debuts as 3-year olds."[5] (Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 5; Pl.'s Facts ¶ 12.)

---

[4] Although Polansky contests these facts, he has not offered any admissible evidence to contradict Mr. Miller's affidavit addressing the health and training of the Illinois Horses.

[5] Defendant Anderson does not contest the substance of paragraph 5 of Polansky's affidavit, nor does he deny that he "communicated [his] impressions and observations regarding these horses to Gelrod and Polansky." (Defs.' MSJ, Ex. 2, Anderson Aff. ¶ 7.)

Polansky testified that he discussed the purchase price for the Illinois horses with both Gelrod and Anderson, while Anderson claims that Gelrod alone negotiated the $350,000 sale price. (*Compare* Defs.' MSJ, Ex. 2, Anderson Aff. ¶ 9 (stating that Gelrod negotiated the price), *with* Defs.' MSJ, Ex. 3, Riccio Aff. ¶ 6 and its Ex. D., Polansky Dep. at 681-684 (stating that Polansky discussed the purchase price with both Gelrod and Anderson, individually).) Polansky submitted an affidavit from Waxman, who stated that "the sale of the horses was negotiated through Monte Gelrod" and that he was not aware of Anderson's involvement until after the sale was consummated. (Pl.'s Opp. to MSJ, Ex. 4, Waxman Aff. ¶¶ 4-5.) Waxman testified that Gelrod offered him $240,000 for the Illinois Horses, having agreed that Gelrod would keep another $10,000 from the purchase price for his commission. (*Id.* ¶ 4.) Gelrod, meanwhile, told Polansky that the "three horses were an incredible sale for $350,000" and that the purchase "would be a terrific investment."[6] (*Id.*) Based on these various representations by Gelrod and Anderson, and based on the horses' pedigree and lines, Polansky decided to buy the Illinois Horses. (*Id.* at 684; Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 10.) Polansky relied on Anderson's "professional evaluation of the horses as [his] trainer in making the ultimate decision to purchase them." (Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 10.) Prior to the purchase of these three horses, Polansky had purchased at least twenty standardbred racehorses. (Defs.' Facts ¶ 12.)

In addition to the disagreement about who negotiated the price with Polansky, the parties

---

[6] In support of their motion, Defendants also submitted expert testimony by Lawrence Miller, President of L.A.M. Standardbreds. (Defs.' MSJ, Ex. 4, Miller Report.) In his report, Miller states that "a fair and reasonable price for this package of these three (3) horses would have been $350,000." (*Id.* at 3.)

also dispute who provided him with payment instructions and how the funds ultimately were distributed. Polansky points the finger at Gelrod, Anderson and Anderson Racing. (*Id.* ¶ 7; Defs.' MSJ, Ex. 3, Riccio Aff. ¶ 6 and its Ex. D., Polansky Dep. at 682 (testifying that he was "given the instructions on how to wire the money by Mrs. Anderson to the account of Anderson Racing").) Defendants, on the other hand, assert that Gelrod instructed Anderson Racing how to distribute the funds. (Defs.' MSJ, Ex. 2, Anderson Aff. ¶¶ 10-11.) Nonetheless, it is undisputed that on April 8, 2003, Janet Anderson[7] of Anderson Racing instructed Polansky to wire the $350,000 purchase price to Anderson Racing Stable and informed him that funds would be disbursed to Waxman and his creditors. (Pl.'s Facts ¶ 21; Pl.'s Opp. to MSJ, Ex. 1, Polansky Aff. ¶ 10.) The following day, Polansky wire-transferred $350,000 to Anderson Racing. (Pl.'s Facts ¶ 22.)

The parties agree that: (a) Waxman, the seller, received $200,000; (b) Ervin Miller received $40,000 relating to Waxman's debt for horse training services; and (c) Anderson Racing received $40,000, representing $35,000 for its inspection services plus an additional $5,000 as a secretarial fee for disbursing the proceeds of the sale. (Pl.'s Facts ¶¶ 24-25, 27; Defs.' Facts ¶ 19.) The parties further agree that Gelrod received $30,000 directly in connection with the transaction and that Northwood Bloodstock Agency received $40,000. (Defs.' Facts ¶ 19.) Polansky asserts that, pursuant to Anderson Racing's instruction, Northwood Bloodstock forwarded $30,000 of that $40,000 amount to Gelrod. (Pl.'s Facts ¶ 29; Pl.'s Opp. to MSJ, Ex. 4, Boni Aff. ¶ 3.) Robert Boni, the President of Northwood Bloodstock, stated that he received a $10,000 check

---

[7] Janet Anderson, a non-party, is Joseph Anderson's wife and the Secretary of Anderson Racing. Although Janet Anderson is authorized to act on behalf of Anderson Racing for certain financial transactions, the parties dispute whether she is authorized to act on behalf of her husband for business purposes. (Defs.' Resp. to Pl.'s Facts ¶ 4.)

for his company's services and that he transferred a separate $30,000 sum to Gelrod per the instruction of either Gelrod or Anderson. (Pl.'s Opp. to MSJ, Ex. 4, Boni Aff. ¶ 3.) Defendants deny that Gelrod received $30,000 from Northwood Bloodstock, without supporting evidence. (Defs.' Resp. to Pl.'s Facts ¶¶ 28-30.)

With respect to the $40,000 retained by Anderson Racing, Defendants' expert witness testified that "additional parties [who are not agents of the buyer or seller] may also receive some sort of compensation if they played a role in putting the deal in place." (Defs.' MSJ, Ex. 4, Miller Report at 3.) Miller further stated that such compensation for Joe Anderson's services relating to the Illinois Horses' sale would be "commonplace in the industry." (*Id.*) Polansky, however, contends that Defendants' compensation was *not* consistent with industry practices and, furthermore, that Anderson "concealed the fact that he was receiving a fee." (Pl.'s Resp. to Defs.' Facts ¶ 22.)

Finally, in support of their counterclaim, Defendants state that Polansky has failed to pay Anderson Racing $5898.50 for training and boarding services. (Defs.' Facts ¶¶ 24-26.) Polansky admits that he has not paid this sum. He further states that the amount is excessive and that he previously complained to Anderson about the expense through Gelrod. (Pl.'s Resp. to Defs.' Facts ¶ 26.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510

(1986).  This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial."  Fed. R. Civ. P. 56(e).  In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor.  *See Anderson*, 477 U.S. at 255.

## ANALYSIS

*A.     Breach of Fiduciary Duty*

To adequately plead a cause of action for breach of fiduciary duty, a plaintiff must allege (1) a fiduciary relationship, (2) a breach of the fiduciary duty, and (3) injury resulting from the breach. *Foodcomm Int'l v. Barry*, 463 F. Supp. 2d 818, 827 (N.D. Ill. 2004)*; Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, at *13 (N.D. Ill. Apr. 28, 2003); *Crichton v. Golden Rule Ins. Co.*, 258 Ill. App. 3d 1137, 1149, 832 N.E.2d 873, 854 (5th Dist. 2005) In Illinois, certain relationships "give rise to a fiduciary duty as a matter of law," such as attorney-client and principal-agent.  *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (N.D. Ill. 1999); *Crichton*, 258 Ill. App. 3d at 1149.  A fiduciary relationship also may exist under special circumstances, where one party reposes trust and confidence in another, who, as a result, gains influence and superiority over the other.  *Foodcomm Int'l*, 463 F. Supp. 2d at 825; *Pommier*, 967 F.2d at 1119; *Crichton*, 258 Ill. App. 3d at 1149.

"When the relationship between the parties is not one that gives rise to a fiduciary relationship as a matter of law, the party asserting the existence of the relationship has the burden of establishing such by clear and convincing evidence." *Gonzalzles v. Am. Exp. Credit Corp.*, 315 Ill. App. 3d 199, 210, 733 N.E.2d 345, 353 (1st Dist. 2000); *see Foodcomm Int'l*, 463 F. Supp. 2d at 825. Factors relevant to determining the existence of a fiduciary relationship include: "the degree of kinship between the parties; the disparity in age, health, mental condition, education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of its business affairs to the 'dominant party' and placed trust and confidence in it." *Gonzalzles*, 315 Ill. App. 3d at 210; *Crichton*, 258 Ill. App. 3d at 854. "In order to establish a fiduciary relationship, the trust and confidence allegedly reposed by the first party must actually be accepted by the second party." *DeWitt Cty Pub. Bldg. Comm'n v. Cty of DeWitt*, 128 Ill. App. 3d 11, 26, 469 N.E.2d 689, 700 (4th Dist. 1984); *Bank Computer Network Corp. v. Continental Ill. Nat'l Bank & Trust of Chi.*, 110 Ill. App. 3d 492, 503, 442 N.E.2d 586, 594 (1st Dist. 1982). In short, "[t]he touchstone of a fiduciary relationship is the presence of a significant degree of dominance and superiority of one party over another." *Zurich Capital Mkts. v. Coglianese*, 332 F. Supp. 2d 1087, 1120-1121 (N.D. Ill. 2004); *see Pommier*, 967 F.2d at 1119 (stressing that the essence of a fiduciary relationship is the domination aspect and commenting that "[t]he fact that one party trusts the other is insufficient. We trust most people with whom we choose to do business").

With these principles in mind, we conclude that Polansky has failed to present evidence raising a genuine question that Defendants owed him a fiduciary duty.[8] The parties do not dispute

---

[8] Polansky apparently does not contend that his relationship with Defendants gave rise to a fiduciary obligation as a matter of law.

that Defendants trained three of Polansky's horses for a period of several months before the purchase

of the Illinois Horses, beginning in the summer 2002.  Polansky also bought a horse, *Sir Rossini N*,

from Anderson in January 2003.  Polansky claims that a fiduciary relationship existed based on these

circumstances, but cites no authority for such a proposition and submits no evidence demonstrating

that the parties' owner-trainer relationship rose to the fiduciary level.  (Pl.'s Opp. to MSJ at 6.)  As

we noted in our July 19, 2006 opinion, "[t]he mere fact that a business transaction is conducted does

not give rise to an inference of a fiduciary obligation."  *Maguire v. Holcomb*, 169 Ill. App. 3d 238,

243, 523 N.E.2d 688, 691 (5th Dist. 1988).

Acknowledging the parties' new but ongoing relationship as of early 2003, we turn to

consider Defendants' role with respect to the Illinois Horses' transaction.  The facts are plain and

undisputed.  As arranged by Gelrod, Anderson inspected the horses on Polansky's behalf and

reported back to Gelrod and Polansky with his impressions and observations.  Although Gelrod

negotiated the purchase price with Waxman, Anderson and Polansky discussed the price by

telephone.  Polansky relied on Anderson's professional evaluation, along with his own research and

Gelrod's opinion, in deciding to buy the horses.  Having so decided, Polansky wired the $350,000

payment to Anderson Racing and entrusted Defendants with its distribution.[9]

Despite Polansky's reliance on Anderson's assessment of the Illinois Horses and testimony

that he trusted Defendants to act on his behalf, Polansky has not established that Defendants

dominated and controlled his decisions in the transaction to the extent necessary to create a fiduciary

obligation.  Polansky has not alleged any kinship or close personal relationship – or even a long-

---

[9] Although Polansky claims that Defendants disobeyed his instructions when disbursing
the funds, he does not provide any evidence describing any such affirmative instructions.

term cordial business relationship – between himself and Defendants, nor has he alleged any "disparity in age, health, mental condition" or education. *Gonzalzles*, 315 Ill. App. 3d at 210. While Defendants certainly had more experience in the standardbred horse racing industry than Polansky, he was no novice and admitted that he had purchased at least twenty other horses before considering the Illinois Horses.

As Defendants demonstrated, Polansky, a trained lawyer, did not rely exclusively on Anderson's evaluation in deciding to purchase the horses. He also relied on his own research and Gelrod's representations. Accordingly, this is not a case where Defendants brought a business opportunity to Polansky but essentially made the decision for him. *See, e.g.*, *Medline Indus., Inc. Employee Profit Sharing & Retirement Trust v. Blunt, Lewis & Loewi, Inc.*, No. 89 C 4851, 1993 WL 13436, at *1314 (N.D. Ill. Jan. 21, 1993) (denying summary judgment where plaintiff-investors presented evidence of social and trusting relationship with broker developed over the course of several years, such that the investors did not question broker's recommendations even when broker neglected to send prospectuses or otherwise advise of risks). Moreover, as Defendants correctly argue, this case is not similar to *Gussin v. Shockey* cited by Polansky, where the defendant had a formal arrangement to act as an agent in the purchasing, insuring, boarding, breeding and sale of horses on behalf of a buyer with no prior experience. 725 F. Supp. 271, 272-273 (D. Md. 1989). Here, Defendants agreed to take on certain nondiscretionary duties related to the transaction – evaluating the Illinois Horses, helping assess the purchase price and disbursing the funds – but by no means did they exert significant control over Polansky's decision or pursestrings. Polansky's claim that he trusted Defendants to complete these discrete tasks with his best interests in mind does not constitute the special circumstances necessary to transform the above-described relationship into

something more. *See, e.g.*, *Ogdon v. Hoyt*, No. 04 C 2412, 2005 WL 66039, at *8 (N.D. Ill. Jan. 11, 2005) ("Allegations that one party trusted another to fulfill its contractual obligations, or that one party was in a dominant business position do not constitute such a special circumstance to turn a formal, contractual relationship into a fiduciary relationship."). Even accepting Polansky's evidence as true at this juncture, he has failed to come forth with specific facts, supported by evidence, to demonstrate that a fiduciary relationship arose between the parties. We therefore grant Defendants' Motion for Summary Judgment as to Count II.

    *B.    Fraud*

In Illinois, a plaintiff pursuing a fraud claim must prove: "'(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.'" *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (*quoting Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996); *see also Hefferman v. Bd. of Trs. of Ill. Cmty. Coll. Dist. 508*, 310 F.3d 522, 525 (7th Cir. 2002); *Soules v. Gen'l Motors Corp.*, 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601 (1980). Polansky alleges that Defendants committed fraud by misrepresenting the training and value of the Illinois Horses, informing him that the sale price was $350,000 rather than $250,000, and concealing Anderson Racing's receipt of $40,000 from the purchase price for its services.

As Defendants have shown, however, there is no evidence that Defendants misrepresented any facts concerning the Illinois Horses or the purchase price. As discussed earlier, Defendants presented the affidavit of the Illinois Horses' trainer, Ervin Miller, who testified that the horses were

"in good health, performing daily and training well at that point in their training regimen preparing for their 2003 staking season." (Defs.' MSJ, Ex. 1, Miller Aff. ¶¶ 9-10.) With respect to the purchase price, Defendants' expert stated that $350,000 was "a fair and reasonable price for this package of these three (3) horses." (Defs.' MSJ, Ex. 4, Miller Report at 3.) Polansky has failed to offer any specific, admissible evidence to raise a genuine question of fact as to these issues.

To the extent that Polansky claims that Defendants knew the purchase price was $250,000, he failed to even allege, let alone prove, that Defendants knew that Gelrod negotiated the lower purchase price with Waxman. The evidence submitted establishes that Joe Anderson discussed the $350,000 purchase price with Polansky, but not that he did so with knowledge that the price was actually $250,000.

Though Polansky's fraud claim based on Defendants' affirmative statements thus fails, there are too many questions regarding his fraudulent concealment allegations to warrant dismissal on the existing evidence.[10] Illinois law provides that:

> In cases of concealment, the traditional fraud analysis is modified, and, in order to prove the concealment amounted to a fraudulent misrepresentation, a plaintiff must prove (1) the concealment of a material fact, (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak . . . , (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist, (4) the concealed information was such that the injured party would have acted differently had it been aware of it, and (5) the reliance by the person from whom the fact was concealed led to his injury.

*Williams v. Chi. Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1052, 654 N.E.2d 613, 622 (1st Dist. 1995) (internal citations omitted); *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-903, 834 N.E.2d

---

[10] Neither party pays substantial attention to this claim. Because Polanksy's fraud claim now hinges on the Defendants' omission of material facts, however, we address the concealment allegations in full.

952, 957-958 (2d Dist. 2005); *see also Stafford Trading Inc. v. Lovely*, No. 05 C 4868, 2007 WL 1512417, at \*10 (N.D. Ill. May 21, 2007).

It is undisputed that Janet Anderson informed Polansky that the $350,000 sale price would be disbursed to the seller, Waxman, and his creditors. Polansky claims that Defendants failed to disclose that Anderson Racing would distribute proceeds to persons *other* than Waxman and his creditors.[11] (Compl. ¶ 29.) The record is void of any evidence from either party addressing whether Defendants intentionally concealed this information to induce a false belief or whether, in the absence of a fiduciary duty, they had any obligation to disclose the details of intended distribution. *Heider v. Leeward Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 270, 613 N.E.2d 805, 814 (2d Dist. 1993) (stating Illinois law that "silence accompanied by deceptive conduct results in an act of concealment, and at that point a duty to disclose arises"); *see also Washington Courte Condominium Assn'-Four v. Washington-Golf Corp.*, 267 Ill. App. 3d 790, 815, 643 N.E.2d 199, 216 (1st Dist. 1994). Defendants have not argued, or provided evidence, that Polansky could have discovered the truth about the planned distribution through any reasonable inquiry or that he would have proceeded with the transaction had he known the truth. Based on the evidence presented, we cannot tell what Polansky and Defendants knew, or didn't know, about the payment arrangements. Did Polansky know that a commission would be included in the price presented to him?[12] Did

---

[11] It is unclear which payments Polansky challenges: the $10,000 check and/or $30,000 wire transfer to Northwood Bloodstock, the $5,000 secretarial fee to Anderson Racing, the $35,000 fee for inspection services to Anderson Racing, the disputed amount to Gelrod, or all of the above. We assume that all payments to persons other than Waxman and his trainer are at issue.

[12] Polansky did not present evidence challenging Defendants' expert's assertions that compensation for Defendants' services relating to the Illinois Horses' sale would be consistent with industry practice.

Defendants know that Polansky believed otherwise? Did Polansky ask anyone – Gelrod, Defendants, Waxman, etc. – who specifically would be receiving what portion of the $350,000? Were Gelrod and Northwood Bloodstock also Waxman's creditors, such that Mrs. Anderson's comment would constitute disclosure as to some of the payments? Did Waxman authorize, as Defendants claim, the $5,000 secretarial fee? (Defs.' MSJ, Ex. 2, Anderson Aff. ¶ 12.) The parties, moreover, dispute whether Defendants distributed the proceeds innocently, per Gelrod's instructions, or whether they participated in planning the distribution. Given these questions of material fact, we deny Defendants' motion as to Count I, to the extent it alleges fraudulent concealment.[13]

## C.    Conspiracy

Under Illinois law, a civil conspiracy arises "when two or more people combine to accomplish, through concerted action, either an unlawful act or a lawful act in an unlawful manner." *Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 537-538, 834 N.E.2d 43, 51 (1st Dist. 2005); *see McClure v. Owens Corning Fiberglass Corp.*, 188 Ill. 2d 102, 133, 720 N.E.2d 242, 258 (1999); *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-63, 645 N.E.2d 888, 894 (1995). A conspiracy claim enables the innocent "to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock*, 164 Ill. 2d at 62, 645 N.E.2d at 894. To that end, a defendant "who understands the general objectives of

---

[13]Because allegations of fraud remain, we deny Defendants' request to dismiss this matter as to the individual defendant, Joseph Anderson. *See Madigan v. Tang*, 346 Ill. App. 3d 277, 283-284, 805 N.E.2d 243, 249-250 (1st Dist. 2004) (stating that corporate officers can be individually liable for tortious conduct in which they personally participate, including fraud); *see also Deluxe Media Servs. LLC v. Direct Dics Network, Inc.*, No. 06 C 1666, 2007 WL 707544, at *4 (N.D. Ill. Mar. 2, 2007); *Abbell Credit Corp. v. Banc of Am. Secs., L.L.C.*, No. 01 C 2227, 2001 WL 1104601, at *6 (N.D. Ill. Sept. 17, 2001).

the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator." *Adcock*, 164 Ill. 2d at 64, 645 N.E.2d at 894; *see also Redelmann v. Claire Sprayway, Inc.*, 874 N.E.2d 230, 241 (1st Dist. 2007).

In light of the genuine issues of material fact previously identified with respect to the remaining fraudulent concealment claim, we similarly deny Defendants' motion as to the conspiracy claim. Pursuant to the above-cited authorities, Defendants could be liable for conspiracy depending on the circumstances surrounding the disbursement of Polansky's $350,000 payment and their knowledge of the alleged scheme.

### D. Defendants' Counterclaim

Defendants assert a counterclaim against Polansky, seeking $5898.50 for breach of contract stemming from Polansky's alleged failure to pay for services. "In Illinois, '[i]n order to plead a cause of action for breach of contract, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.* 491 F.3d 625, 631 (7th Cir. 2007) (*quoting W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759, 814 N.E.2d 960, 967 (2004)).

In response to Defendants' motion, Polansky admits that he hired Anderson Racing "to provide training and boarding services to the horses." (Defs.' Facts ¶ 24.) He further admits that he was billed for these services, has not paid for them and owes $5898.50. (*Id.* ¶¶ 25-26.) Polansky adds, however, "that the amount due for the training and boarding services was excessive and informed Anderson through Gelrod of same." (Pl.'s Resp. to Defs.' Facts ¶ 26.) Polansky's complaint about the cost of the services is unavailing and unsupported. He failed to provide any

evidence challenging Defendants' factual submissions (including invoices and Joseph Anderson's affidavit) or raising a question that the boarding and training fees were, in fact, "excessive." Moreover, he neglected to assert any affirmative defenses that might mitigate his liability for these fees, such as unclean hands, equitable estoppel, unenforceability of contract, failure of Defendants to perform their duties, or a right to set-off. (Pl.'s Ans. to Defs.' Counterclaim.) *See*, *e.g., Reis Robotics USA, Inc. v. Concept Indus., Inc.*, 462 F. Supp. 2d 897, 906 (N.D. Ill. 2006) (observing that Rule 8(c) contemplates that a party admit the allegations and then assert "that for some legal reason it is nonetheless excused from liability"). In light of his admissions and failure to articulate any legally or factually sufficient defense, we grant Defendants' motion in favor of their counterclaim.

## CONCLUSION

For the reasons set forth above, we grant in part and deny in part Defendants' Motion to Strike Affidavits in Whole or in Part and Other Relief. We grant Defendants' Motion for Summary Judgment as to Count II (breach of fiduciary duty) but deny it as to Counts I (fraudulent concealment) and III (civil conspiracy).[14] We also grant Defendants' Motion for Summary Judgment in favor of their breach of contract counterclaim for $5898.50. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Date: November 20, 2007

---

[14]As we do not dismiss the action entirely, we decline to address Defendants' arguments seeking dismissal of Polansky's claims for damages and attorneys' fees.